UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MAINE STATE PROPERTIES, LLC, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 2:15-cv-140-JHR |
| | ) | |
| CHUBB CUSTOM INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant | ) | |

MEMORANDUM DECISION ON MOTION FOR SUMMARY JUDGMENT
AND MOTION TO EXCLUDE EXPERT[1]

Defendant, Chubb Custom Insurance Company ("Chubb"), moves for summary judgment

on all claims of the plaintiff, Maine State Properties, LLC ("Maine State"), arising from Chubb's

denial of coverage for a December 17, 2013, property loss suffered by Maine State when pipes

froze in an insured commercial building in Biddeford, Maine.  *See* Defendant's Motion for

Summary Judgment ("S/J Motion") (ECF No. 25) at 1-2; Complaint (ECF No. 1-1), attached to

Notice of Removal of Defendant (ECF No. 1), ¶¶ 5-21.  In its three-count complaint, Maine State

seeks (i) a declaratory judgment that Chubb is obligated to pay for Maine State's provable damages

as a result of the December 17, 2013, loss (Count I), (ii) damages for Chubb's alleged breach of

contract (Count II), and (iii) damages for Chubb's alleged violation of the Maine Unfair Claims

Settlement Practices Act ("UCSPA"), 24-A M.R.S.A. § 2436-A (Count III).  *See* Complaint ¶¶ 13-

21.  Chubb also moves to exclude all expert testimony of insurance professional Michael L. Averill

on the basis that it constitutes impermissible legal argument and is irrelevant.  *See* Defendant

Chubb Custom Insurance Company's Motion To Exclude the Expert Testimony of Michael L.

---

[1] The parties have agreed to have me preside over all proceedings in this action, including the entry of judgment.  ECF No. 7.

Averill ("Motion To Exclude") (ECF No. 24) at 1-2. For the reasons that follow, I grant Chubb's motion for summary judgment in part, as to Maine State's USCPA claim (Count III), and otherwise deny it, and grant its motion to exclude Averill's testimony.

## I.  Motion for Summary Judgment

### A.  Applicable Legal Standards

### 1.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). "A dispute is genuine if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." *Johnson v. University of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id*. (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Johnson,* 714 F.3d at 52. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (quoting *Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006) (emphasis omitted)); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on

2

which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

## 2.  Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id*.  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id*.  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id*.  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id*.

Local Rule 56 directs that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(f).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary

3

judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact."  *Id.*; *see also, e.g., Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## B.  Factual Background

The parties have stipulated to a number of facts in addition to filing separate statements of material facts.  I have set forth their stipulated facts, as well as their separate statements of material facts, crediting the latter to the extent either admitted or supported by record citations in accordance with Local Rule 56, with disputes resolved in favor of Maine State as the nonmovant.[2]

Maine State was formed by Jeffrey Sneller of Bainbridge Island, Washington, James Swaka of Biddeford, Maine, and Mark Lisson of Bainbridge Island, Washington.  Defendant's Statement of Material Facts in Support of Motion for Summary Judgment ("Defendant's SMF") (ECF No. 26) ¶ 2; Plaintiff's Opposing Statement of Material Facts ("Plaintiff's Opposing SMF") (ECF No. 28) ¶ 2.  Sneller and Swaka are managers of Maine State, and Sneller, Swaka, and Lisson are affiliated with corporations that are members of Maine State.  *Id.* ¶ 3.

Chubb issued Maine State a commercial property policy of insurance, Policy Number 99782618-00 (the "Policy"), effective September 5, 2013, to September 5, 2014, covering property located at 145 Main Street in Biddeford, Maine (the "Property").  Stipulated Record for

---

[2] Statements that are qualified are assumed to be admitted subject to that qualification, unless a qualification indicates otherwise.  To the extent that I have incorporated one side's qualification into the statement of the other, I have determined that the qualification is supported by the record citation(s) given.  I have omitted qualifications that are unsupported by the citation(s) given or are redundant.  To the extent that I have taken into consideration a denial of a statement, I have determined that the denial is supported by the citation(s) given.

Defendant's Motion for Summary Judgment ("Stipulations") (ECF No. 21) ¶ 1 & Exh. A (ECF No. 21-1) thereto.  The Policy was underwritten by WKFC Underwriting Managers.  Defendant's SMF ¶ 1; Plaintiff's Opposing SMF ¶ 1.

At the time the Policy was in effect, Maine State was the lessee of the Property pursuant to a November 12, 2012, lease with JED Properties, LLC ("JED").  Stipulations ¶ 2.[3]  The parties agree that, at all relevant times, Maine State had an insurable interest in the Property.  *Id.* ¶ 3.  The Policy provided that Chubb would "pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."  Policy at Page ID #91.  "Covered Causes of Loss" is defined in the Policy to mean "Risks of Direct Physical Loss, unless the loss is . . . [e]xcluded in Section **B.**, Exclusions; or . . . [l]imited in Section **C.**, Limitations[.]"  *Id.* at Page ID #115.

As lessee of the Property, Maine State was responsible for maintaining heat in the insured premises.  Stipulations ¶ 5.  As lessee in possession, Maine State had complete access to and control over the insured premises at all relevant times.  *Id.* ¶ 6.  Swaka was the person from Maine State who was in charge of maintaining the Property, including maintaining the heat in the building.  *Id.* ¶ 7.  Swaka had never managed a building before managing the Property.  *Id.* ¶ 8.

The insured premises consists of an approximately 3,155-square-foot unfinished basement, a street level floor consisting of approximately 3,155 square feet of finished retail space with an additional approximately 1,100 square feet of finished mezzanine floor, and second, third, and fourth floors each consisting of approximately 3,300 square feet of finished residential apartments.  *Id.* ¶ 9.

---

[3] JED previously was a plaintiff in this action but was dismissed with prejudice by agreement of the parties pursuant my order of January 21, 2016.  *See* ECF Nos. 22-23.

At the time of the loss, a natural gas steam boiler, installed for Maine State by Multispec in 2013, was located in the basement, producing steam for the building's radiator system, which provides heat to the upper floors (residential) and the basement. *Id*. ¶ 10. At the time of the loss, hot water was provided by two gas-fired "tankless" hot water heaters, also installed in 2013. *Id*. ¶ 11. At all relevant times, a warm air furnace, with its own gas line, was present on the premises to provide heat to the first floor/mezzanine space. *Id*. ¶ 12.

Shortly after the issuance of the Policy, on September 20, 2013, Reliable Inspection ("Reliable") performed an inspection of the Property. *Id*. ¶ 13 & Exh. B (ECF No. 21-2) thereto. Reliable performed the inspection at the request of the underwriter in order to verify the information provided to underwrite the policy. Defendant's SMF ¶ 5; Affidavit of Theresa Heyburn (ECF No. 26-1), attached thereto, ¶ 4.[4] Diane Van Camp of Reliable performed the inspection and dealt with Swaka. Defendant's SMF ¶ 6; Plaintiff's Opposing SMF ¶ [6].[5]

On December 17, 2013, a property loss occurred at the Property fundamentally caused by frozen pipe(s). Stipulations ¶ 14. On the day of the loss, Swaka was working at Idexx from 5 a.m. to 1:30 p.m. Defendant's SMF ¶ 7; Plaintiff's Opposing SMF ¶ [7]. Tenants on the upper floors of the Property reported to Swaka, who was at work at Idexx at the time, that they were experiencing a loss of hot water. Stipulations ¶ 15. Swaka recalls that he began receiving those calls from tenants at about 9:00 a.m. to 10:00 a.m. Defendant's SMF ¶ 8; Plaintiff's Opposing SMF ¶ [8]. Swaka called Multispec, which had access to the building, to request assistance.

---

[4] As Chubb observes, Defendant's Reply Statement of Material Facts ("Defendant's Reply SMF") (ECF No. 31) at 1 n.1, Maine State seemingly inadvertently skipped over Defendant's SMF ¶ 5, causing it to respond to only 32 of the Chubb's 33 statements of material facts. I have renumbered Maine State's responses to paragraphs 6 through 33 to align them with the statements to which they respond.

[5] I omit Chubb's further assertion that Van Camp asked Swaka if the vacant retail space would be heated and Swaka told her that it would be, Defendant's SMF ¶ 6, which Maine State denies, Plaintiff's Opposing SMF ¶ [6], viewing the evidence in the light most favorable to Maine State, as nonmovant.

Stipulations ¶ 16.  Swaka told Mr. Multer of Multispec that there were problems with water in the building and asked that Multispec check on the building because Swaka was still at work. Defendant's SMF ¶ 9; Plaintiff's Opposing SMF ¶ [9].[6]  Multispec was the company that had installed the new steam boiler in the summer of 2013 and, when doing so, had also insulated some of the pipes in the basement.  *Id.* ¶ 10.

On the day of the loss, a Multispec employee who was familiar with the Property responded to Swaka's call, arrived at the vacant retail space, and could see his breath because it was so cold. Defendant's SMF ¶ 11; Affidavit of Marc J. Leclerc ("Leclerc Aff.") (ECF No. 26-5), attached to Defendant's SMF, ¶¶ 4-5.  He found that the heat to the warm air furnace, the direct heat source to the retail space, was turned off.  Defendant's SMF ¶ 11; Leclerc Aff. ¶ 6.  The Multispec employee was instructed by his boss to turn on the furnace, which he did.  Defendant's SMF ¶ 12; Leclerc Aff. ¶ 7.

When Swaka later arrived at the Property at about 2:00 p.m., he discovered a significant amount of flooding in the retail space.  Stipulations ¶ 17; Defendant's SMF ¶ 13; Plaintiff's Opposing SMF ¶ [13].  Swaka called the fire department, called Multispec again, and called his plumber because he was not sure what to do.  Defendant's SMF ¶ 14; Plaintiff's Opposing SMF ¶ [14].  Swaka states that Multer of Multispec arrived at the premises afterwards to begin making emergency repairs.  *Id.* ¶ 15.

At the time of the loss, the retail space on the ground floor and mezzanine was vacant. Stipulations ¶ 18.  The pipes in the Property had not been drained as of that time.  *Id.* ¶ 19.  Prior to the loss, Swaka was not aware that the warm air furnace had to be turned on through a separate

---

[6] Mr. Multer's first name is not provided.  Nothing turns on the omission.

mechanism (separate from the gas boiler) in order to produce heat directly to the first floor/mezzanine.  Defendant's SMF ¶ 16; Plaintiff's Opposing SMF ¶ [16].

Maine State, through its agent, reported the property damage claim to Chubb on December 18, 2013.  Stipulations ¶ 21. Chubb immediately assigned the matter to Braedy McKay, a property claims analyst for York Risk Services Group ("York").   Defendant's SMF ¶ 17; Plaintiff's Opposing SMF ¶ [17].  With the assistance of a colleague, McKay referred the matter to a field adjuster on December 19, 2013, in order to set up an inspection of the Property.  *Id.* ¶ 18.  On December 20, 2013, Gregory Niedbala of York SLA, Inc., performed an inspection and took photographs at the scene of the loss.  *Id.* ¶ 19.

During his inspection of the Property, Niedbala viewed the damage and specifically observed several previously frozen pipes that had burst within the first floor vacant retail space and that were reportedly detached from the building's plumbing system from within the vacant first floor area.  *Id.* ¶ 20.  Niedbala observed that all burst pipe repairs to the plumbing system in the building were made within or below the vacant first floor area.  *Id.* ¶ 21.  He further observed that a large amount of water had escaped from the burst pipes, damaging and flooding the vacant first floor and basement areas.  *Id.* ¶ 22.  In turn, Niedbala was advised that all water damage to the Property was limited to the first floor and basement areas.  *Id.* ¶ 23.[7]

As part of his investigation, Niedbala checked weather conditions in Sanford, Maine, on December 17, 2013, which revealed a low temperature that day of minus 16 degrees Fahrenheit. *Id.* ¶ 24.  Niedbala also determined that the temperature on December 17, 2013, was lower than it had been the two days prior, although it was quite cold on those days, as well.  *Id.* ¶ 25.  The

---

[7] Maine State qualifies this statement, asserting that Niedbala may have been so advised but that the information was incorrect in that some areas of the residential apartments on the second floor sustained water damage, as well. Plaintiff's Opposing SMF ¶ [23]; Affidavit of James K. Swaka ("Swaka Aff.") (ECF No. 28-1), attached thereto, ¶ 7.

temperature on December 15, 2013, ranged from a low of 6 degrees Fahrenheit to a high of 21 degrees Fahrenheit, while the temperature on December 16, 2013, ranged from a low of 0 degrees Fahrenheit to a high of 24 degrees Fahrenheit.  *Id.*[8]

During his inspection of the Property, Niedbala noted that the retail space had its own heat source, a warm air furnace with its own gas line, which provided heat only to the first floor/mezzanine retail space, as opposed to the basement or upper residential floors.  *Id.* ¶ 26. Niedbala also noted that the insured, Maine State, did not have any fail-safe warning devices on the first floor to make sure that heat was maintained in the vacant retail space at some minimal level.  *Id.* ¶ 27.  Prior to the loss, there were no fail-safe warning devices anywhere in the Property to make sure that heat was maintained at some minimal level.  Stipulations ¶ 24.  In Niedbala's opinion, a building owner in Maine should maintain heat throughout a building at a minimum of 55 degrees during the winter or drain pipes in order to prevent them from bursting.  Defendant's SMF ¶ 28; Niedbala Aff. ¶ 10.[9]

On the day immediately preceding the loss, Margaro Vasquez, a contractor renovating an apartment in the insured premises for Maine State, used the empty retail space to paint cabinet doors he had removed from the kitchen in that apartment.  Additional Material Facts ("Plaintiff's Additional SMF"), commencing at page [3] of Plaintiff's Opposing SMF, ¶ 33; Swaka Aff. ¶ 6.[10]

---

[8] Maine State qualifies paragraph 25, asserting that the temperatures listed were recorded in Sanford, Maine, which is approximately 20 miles southwest of and inland from the Property.  Plaintiff's Opposing SMF ¶ [25].  For that proposition, it cites the affidavit of Niedbala, *see id.*; however, the proposition is not supported by the citation given. Nowhere in his affidavit does Niedbala address the precise location of Sanford relative to Biddeford.  *See generally* Affidavit of Gregory P. Niedbala ("Niedbala Aff.") (ECF No. 26-7), attached to Defendant's SMF.  My own research indicates that, while Sanford is southwest of Biddeford, it is approximately 18 miles distant.  I take judicial notice of that information.  Nothing turns on the difference in mileage.

[9] Maine State objects to this statement on the basis that Niedbala's opinion cannot establish any fact on which summary judgment can be based.  Plaintiff's Opposing SMF ¶ [28].  However, it fails to cite any authority or make any reasoned argument in support of that objection.  *Id.*  The objection, accordingly, is overruled.

[10] Chubb objects to this statement on the basis that it relies on an affidavit of an interested witness contradicting his earlier sworn testimony, namely, Swaka's deposition testimony that he did not remember what he did when he went to the Property on December 16, 2013, and that Vasquez was a plumber (rather than a contractor).  Defendant's Reply

Vasquez never complained to Swaka that the retail space was too cold to paint in.  Plaintiff's Additional SMF ¶ 34; Swaka Aff. ¶ 6.[11]

As part of his investigation, Niedbala was provided with an unsolicited email from one of Maine State's managers, Sneller.  Defendant's SMF ¶ 29; Plaintiff's Opposing SMF ¶ [29].  In the email, dated December 21, 2013, Sneller stated:

> Harvey Multer (Multi Spec) and I discussed the mystery of the frozen pipes, and it is his recollection that the furnace was never on – at least for the past 12 months – the reason being that it was unnecessary.  Neither James nor Margaro, (nor anyone else), noticed because the pipes in the basement were uninsulated and exposed, amply heating the entire retail space above them.  When Multi Spec installed the new boiler and hot water system, they also insulated the pipes, which caused a drop in temperature, and they never thought to turn on the furnace – nor did we.

> Regardless, it was not the piping in apartments 2 and 3 that froze, it was likely a brass wall pipe in the basement, which created pressure on the joints of the thinner copper pipes above, causing them to rupture – and when the heat was turned on, water flooded through the broken joints and cracks.

> I checked our Unitil bill, and meter readings, which would indicate he is correct (i.e., zero usage).

SMF ¶ 33; [Rule] 30(b)(6) Deposition of Maine State Properties, LLC/Deposition of James Swaka ("Swaka Dep.") (ECF No. 26-4), attached to Defendant's SMF, at 9-11, 91.  In the alternative, Chubb denies the statement.  *Id.*  In support of its objection, Chubb relies on the principle that, "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed."  *Zip Lube, Inc. v. Coastal Sav. Bank*, 1998 ME 81, ¶ 10, 709 A.2d 733, 735 (quoting *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994)).  The objection is overruled.  In the cited passage of Swaka's deposition transcript, Swaka was asked, after testifying that he went to the Property every day and had gone there on December 16, 2013, "What did you do on December 16, 2013?"  Swaka Dep. at 91.  He responded, "I don't remember."  *Id.*  When a witness has indicated that he or she cannot remember, the later provision of assumedly remembered detail does not contradict a clear answer to an unambiguous question.  *See, e.g., Gammon v. Crisis & Counseling Ctrs., Inc.*, 762 F. Supp.2d 165, 169 & n.3 (D. Me. 2011): *Donahue v. Clair Car Connection, Inc.*, 736 F. Supp.2d 294, 302 n.17 (D. Me. 2010); *Hinkley v. Baker*, 122 F. Supp.2d 57, 59 n.1 (D. Me. 2000).  Even assuming that Swaka's description of Vasquez as a contractor contradicts his testimony that Vasquez was a plumber, *see* Swaka Dep. at 9-11, that detail, standing alone, does not create a basis on which Maine State can resist summary judgment.  Rather, it goes to the weight of Swaka's assertions regarding his interaction with Vasquez.  To the extent that Chubb denies the statement, I view the evidence in the light most favorable to Maine State, as nonmovant.

[11] Chubb objects to this statement on the same basis as it objects to Plaintiff's Additional SMF ¶ 33 as well as the additional basis that the statement contains inadmissible hearsay.  Defendant's Reply SMF ¶ 34.  In the alternative, Chubb denies the statement.  *Id.*  Chubb's *Colantuoni* objection is overruled for the same reasons discussed above.  Its hearsay objection is overruled on the ground that Vasquez's asserted lack of complaint regarding the cold meets the hearsay exception for a "present sense impression," defined as "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it."  Fed. R. Evid. 803(1).  To the extent that Chubb denies the statement, I view the evidence in the light most favorable to Maine State, as nonmovant.

10

Plaintiff's Additional SMF ¶ 35; Exh. B to Niedbala Aff.[12]

Niedbala's investigation also revealed that less than 15 percent of the vacant retail space was located directly above the boiler room in the basement.  Defendant's SMF ¶ 31; Plaintiff's Opposing SMF ¶ [31].

Niedbala provided his investigative findings and recommendations to York, which shared the information with Melissa Allejos, a property claims adjuster at Chubb.  *Id.* ¶ 32.  Chubb issued a letter to Maine State on January 6, 2014, denying coverage for the loss.  Stipulations ¶ 26 & Exh. D ("Denial Letter") (ECF No. 21-4) thereto.

Chubb denied coverage on the basis of the following exclusion set forth in paragraph B(2)(g) (Exclusions) of Policy form Causes of Loss – Special Form CP 10 30 06 07 ("Exclusion B(2)(g)"):

> **2.** We will not pay for loss or damage caused by or resulting from any of the following:
>
> ***
>
> **g.** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:
>
> > **(1)** You do your best to maintain heat in the building or structure; or
> >
> > **(2)** You drain the equipment and shut off the supply if the heat is not maintained.

Denial Letter; Policy, at Page ID #116-17.

Chubb's denial of coverage was timely.  Stipulations ¶ 27.

Maine State filed a chapter 11 bankruptcy action on June 9, 2015.  *Id.* ¶ 28.

---

[12] My recitation incorporates Chubb's qualification (characterized as an objection) that the email speaks for itself. Defendant's Reply SMF ¶ 35.

On February 15, 2016, a water pipe located inside an exterior wall in the vacant mezzanine/retail area of the Property froze.  Plaintiff's Additional SMF ¶ 36; Defendant's Reply SMF ¶ 36.  At the time the pipe froze, the gas hot air furnace located on the mezzanine level was operating, maintaining a temperature of 60 degrees Fahrenheit in the retail area.  *Id.* ¶ 37.[13]

At the time it issued the Policy to Maine State, Chubb had available to it the ISO Protective Safeguards Endorsement, a form on which it could have required the insured to do specific things as a condition of coverage, such as maintain heat in every area of the building, wrap the pipes, or install a fail-safe alarm system.  Plaintiff's Additional SMF ¶ 38; Defendant's Reply SMF ¶ 38.[14]

### C.  Discussion

As Chubb notes, *see* S/J Motion at 6, Maine State's declaratory judgment and breach of contract claims (Counts I and II) go hand-in-hand: the gravamen of both is that Chubb wrongly denied coverage for the December 17, 2013, loss.  Therefore, I consider those two counts together.  For the reasons that follow, I conclude that Chubb demonstrates its entitlement to summary judgment solely as to Maine State's UCSPA claim (Count III).

#### 1.  Declaratory Judgment/Breach of Contract Claims

Chubb seeks summary judgment as to Counts I and II on the basis that it properly invoked Exclusion B(2)(g) to deny coverage for the December 17, 2013, loss, Maine State having failed to "do [its] best to maintain heat in the building or structure[.]"  S/J Motion at 6-11.  It argues that

---

[13] Chubb objects to paragraphs 36 and 37 on two bases: that the loss just occurred, as a result of which Chubb has not had sufficient time to investigate it, and in any event the new loss is irrelevant to whether Chubb properly excluded coverage for the loss at issue in this case.  Defendant's Reply SMF ¶¶ 36-37.  Chubb cites no authority for the proposition that its lack of time to investigate the loss renders the evidence inadmissible.  For the reasons discussed below, the evidence is relevant.

[14] Chubb objects that whatever additional forms it may or may not have had available when issuing the Policy to Maine State are irrelevant.  Defendant's Reply SMF ¶ 38.  In the alternative, it qualifies this statement, asserting that the Policy was endorsed on October 15, 2013, to add a similar Protective Safeguards endorsement, Form IL 04 15 04 98, as well as a corresponding Protective Safeguards – Locked and Secured endorsement, Form 10-02-1725.  *Id.*; Policy at Page ID ##160-61.  I have taken paragraph 38 into consideration but find, for the reasons set forth below, that it is immaterial.

there is no triable issue of material fact that Maine State failed to satisfy this standard, which it contends is clear and unambiguous.  *See id.*

Maine State counters that Exclusion B(2)(g) was not in effect at the time of the loss, having been superseded by the Policy's Water Exclusion Endorsement.  *See* Plaintiff Maine State Properties, LLC's Objection to Defendant Chubb Custom Insurance Company's Motion for Summary Judgment ("S/J Opposition") (ECF No. 27) at 3-4.  In the alternative, it argues that even if Exclusion B(2)(g) was in effect, its language is ambiguous and should be construed against the drafter (Chubb), and there is a triable issue of fact as to whether Maine State complied with that obligation. *See id.* at 4-7.

Maine law provides that, in an action for damages for breach of an insurance contract, the insured bears the initial burden of showing that injury falls within the scope of the contract.  *See, e.g., Middlesex Mut. Assurance Co. v. Fish*, 738 F. Supp.2d 124, 132 (D. Me. 2010).  "Once coverage is shown, the burden switches to the insurer to establish that the conduct at issue is subject to a policy exclusion."  *Id.* (citations and internal quotation marks omitted).

The court "interpret[s] any unambiguous language in the policy according to its plain meaning" and "construe[s] ambiguous policy language strictly against the insurance company and liberally in favor of the policyholder."  *Cox v. Commonwealth Land Title Ins. Co*., 2013 ME 8, ¶ 8, 59 A.3d 1280, 1283.  "Policy language is ambiguous if it is reasonably susceptible of different interpretations or if any ordinary person in the shoes of the insured would not understand that the policy did not cover claims such as those brought."  *Id.* (citation and internal quotation marks omitted).

There is no issue in this case as to whether the loss fell within the scope of the Policy.  The sole question is whether the exclusion was properly applied.

### a.  Was Exclusion B(2)(g) Superseded?

The Water Exclusion Endorsement on which Maine State relies provides:

> **A.** The exclusion in Paragraph **B.** replaces the **Water** Exclusion in this Coverage Part or Policy.
>
> **B.  Water**
>
> > **1.** Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);
> >
> > **2.** Mudslide or mudflow;
> >
> > **3.** Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;
> >
> > **4.** Water under the ground surface pressing on, or flowing or seeping through:
> >
> > > **a.** Foundations, walls, floors or paved surfaces;
> > >
> > > **b.** Basements, whether paved or not; or
> > >
> > > **c.** Doors, windows or other openings; or
> >
> > **5.** Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **1.**, **3.**, or **4.**, or material carried or otherwise moved by mudslide or mudflow.
>
> This exclusion applies regardless of whether any of the above, in Paragraphs **1.** through **5.**, is caused by an act of nature or is otherwise caused.  An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.
>
> But if any of the above, in Paragraphs **1.** through **5.**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

Policy at Page ID #125.

Nonetheless, as Chubb argues, *see* Defendant's Reply Memorandum of Law in Support of Motion for Summary Judgment ("S/J Reply") (ECF No. 30) at 1-2, this endorsement plainly supersedes a different exclusion specifically titled "**Water**" (Exclusion B(1)(g)), which excludes coverage for identical, or nearly identical versions of the first four categories enumerated above, with a proviso nearly identical to that provided in the last paragraph, above, *compare* Policy at Page ID #116 *with id.* at Page ID #125.   Moreover, as Chubb points out, *see* S/J Reply at 2, if the Water Exclusion Endorsement were construed to replace Exclusion B(2)(g) rather than Exclusion B(1)(g), it would leave the Policy with an endorsement largely duplicative of Exclusion B(1)(g), rendering a portion of the Policy superfluous.   This further counsels against construing the Policy in that manner.   *See, e.g., Jipson v. Liberty Mut. Fire Ins. Co*., 2008 ME 57, ¶ 10, 942 A.2d 1213, 1216 ("All parts and clauses [of an insurance policy] must be considered together that it may be seen if and how far one clause is explained, modified, limited or controlled by the others."); *Acadia Ins. Co. v. Buck Constr. Co*., 2000 ME 154, ¶ 9, 756 A.2d 515, 517 (court will construe a contract to give force and effect to all of its provisions and avoid an interpretation that renders any particular provision meaningless).

Accordingly, Exclusion B(2)(g) was not superseded by the Water Exclusion Endorsement.

### b.  Is Exclusion B(2)(g) Ambiguous?

Chubb acknowledges that Maine courts have not had occasion to construe the meaning of the language in Exclusion B(2)(g) requiring an insured to "do [its] best to maintain heat in the building or structure[.]"  S/J Motion at 8.   However, it notes that to do one's best is defined as to act to "the greatest extent or degree" and to "maintain" is defined as to sustain, or to "keep in existence."  *Id*.; *see also* Webster's II New Riverside Univ. Dictionary 168, 717 (1994).   It points out that the Court of Appeals of Wisconsin held a virtually identical exclusion unambiguous, *see*

S/J Motion at 8 (citing *Continental W. Ins. Co. v. Paul Reid, LLP*, 715 N.W.2d 689 (Wis. Ct. App. 2006)), and that courts interpreting the phrase "best efforts" in other contexts have construed it to impose an obligation to use "due diligence" or "reasonable efforts[,]" *id.* (quoting *Permanence Corp. v. Kennametal, Inc*., 908 F.2d 98, 100 n.2 (6th Cir. 1990)).  Chubb reasons that, therefore, Exclusion B(2)(g) required Maine State, at the very least, to exercise due diligence or reasonable efforts to maintain heat in the building.  *See id.* at 8-9.

Maine State cites *Sonrob Hosts, LLC v. Lafayette Ins. Co*., No. 3:11-CV-03094, 2012 WL 5336966, at 7-8 (W.D. Ark. Oct. 26, 2012), for the proposition that the language at issue is ambiguous, setting a subjective standard as to what an insured's "best" may entail.  *See* S/J Opposition at 4-5.  It asserts that Chubb could have, but did not, impose specific objective requirements on which coverage for water damage resulting from frozen pipes would depend, such as requiring the insured to wrap the pipes or install a fail-safe alarm system to maintain heat.  *See id.* at 5.  It observes that the First Circuit has found an insurer's failure to use available language to exclude or restrict its coverage relevant to whether the insurer intended not to so limit its coverage.  *See id.* (citing *Merchants Ins. Co. of N.H., Inc. v. United States Fid. & Guar. Co*., 143 F.3d 5, 10 (1st Cir. 1998); also citing *Lexington Ins. Co. v. Travelers Indem. Co. of Ill.*, 21 Fed. Appx. 585, 590 (9th Cir. 2001)).

Maine State adds that the term "maintain," when used in insurance contracts, also has been construed by some courts as ambiguous, albeit in a different context.  *See id.* (citing *Five Star Hotels, LLC v. Insurance Co. of Greater N.Y.*, No. 09 Civ. 8717(PGG), 2011 WL 1216022 (S.D.N.Y. Mar. 24, 2011), for the proposition that a clause requiring an insured to "maintain" certain protective devices was hopelessly ambiguous).

It argues that, if the court were to accept Chubb's position, the only way Maine State could have done its "best to maintain heat in the building or structure" would have been to directly heat all areas of the building whether occupied or not, which amounts to construing that phrase liberally in favor of the insurer rather than the insured.  *See id*. at 6.  It asserts that, in both *Sonrob* and *American Nat'l Prop. & Cas. Co. v. Fredrich 2 Partners, Ltd*., 408 S.W.3d 610 (Tex. App. 2013), courts held that insureds had satisfied the obligation to do their best to maintain heat in buildings despite not heating vacant portions of those buildings.  *See id*.

*Paul Reid*, the authority cited by Chubb in support of the proposition that the phrase at issue is unambiguous, is not persuasive.  The insured in that case argued that "best" was "an ambiguous term of degree" and that the inclusion of the word "your" (as in "your best") meant that the standard depended "on who the insured is, giving the policy language an infinite number of reasonable interpretations."  *Paul Reid*, 715 N.W.2d at 680 (internal quotation marks omitted).  The court disagreed, reasoning that this did "not demonstrate the language can be reasonably interpreted to mean different things" but rather that "the language will lead to different conclusions when applied to different factual scenarios."  *Id*.  It held, "The do-your-best language contained in the Continental policy is no more ambiguous than other terms used in insurance policies, such as 'negligence' or 'diligent.'"  *Id*.  Yet, whereas the terms "negligent" and "diligent" suggest an objective measurement of an insured's conduct, the phrase "your best" can be construed to reflect a subjective standard.  As the court in *Sonrob* held, "The Policy does not define what it means to 'do your best' to 'maintain heat.'"  *Sonrob,* 2012 WL 5336966, at *7.

Given that ambiguity, the *Sonrob* court construed the language requiring Sonrob to "do its best" in favor of Sonrob to impose "a duty . . . to use reasonable efforts."  *Id*. (citation and internal

17

quotation marks omitted).  It elaborated, "A best efforts requirement in a contract should be viewed as requiring good faith and sound business judgment."  *Id*.

Citing *Five Star*, the court noted that, because the word "maintain" in insurance contracts has been construed as ambiguous, albeit in a different context, it "could find . . . that it is unclear what the Policy required in regards to 'maintaining heat.'"  *Id*.  Yet, it concluded, "No matter the interpretation of 'maintain,' . . . Sonrob did maintain heat in the building by implementing a cross-heating system, which is a commonly used system in motels in the Eureka Springs[, Arkansas,] area when a motel is closed to customers for the winter off-season."  *Id*.[15]  It explained:

> The Policy language did not require Sonrob to maintain heat in each room, but rather to maintain heat in the building.  Cross heating is a reasonable method to maintain heat in the building to prevent pipes from freezing when the motel is closed to customers.  The fact that cross heating is commonly used in motels in the Eureka Springs area; that the Schmids had used the system successfully in times of low temperatures in the past; that the Schmids implemented the system based on the advice of the former motel manager who also claimed to have used the system to heat the same motel; and that no other pipes in the building burst despite the low temperatures in Eureka Springs in January 2011 all tend to indicate and to support the Court's finding that the Schmids acted reasonably and in good faith in implementing the cross-heating system to maintain heat at the Lookout Lodge in January 2011.
>
> The 'do your best' clause in the Policy cannot be construed so as to mandate that Sonrob, acting through the Schmids, go beyond exercising good business judgment to heat every room in the motel at all times, regardless of whether the motel is open for business and regardless of whether a reasonable method is available that would maintain heat at an adequate level throughout the building.

*Id*. at *7-*8.

---

[15] The property at issue in *Sonrob*, Lookout Lodge, consisted of a three-story motel building with 16 rooms and a living quarters for the Schmids, the couple who formed Sonrob, which owned the property.  *See Sonrob*, 2012 WL 5336966, at *1, *4.  Each guest room had its own wall heater.  *Id.* at *4.  The building was cross-heated by turning on the heat in selected rooms to the "low heat" position, with the wall heaters in the remaining rooms turned to the "off" position.  *Id*.  The insurer in *Sonrob* denied coverage, invoking language identical to that at issue here, after a pipe froze in one of the unheated rooms.  *See id*. at *3, *6.  The court found: "Even though the heat was not turned on in Room 23, the most likely cause of the freeze was the penetration of cold air to a pipe that was not adequately insulated. The pipe would have likely frozen from the cold air even if the heat were turned on in Room 23."  *Id*. at *6.

While Maine State cites *Sonrob* for the proposition that the phrase at issue is ambiguous, it evidently does not urge the court to adopt *Sonrob*'s construction of that phrase.  Rather, as I understand its position, it asks the court to find that because Chubb could have opted to describe specific criteria for coverage, such as directly heating all areas of the building, wrapping pipes, and so forth, the court should find that Chubb did not intend to exclude coverage if Maine State failed to do any of those things.  Yet, that approach compares apples with oranges: in lieu of enumerating specific means by which Maine State was to maintain heat in the building, the Policy provided that Maine State had to use its best efforts to achieve that end.

By contrast, the courts in *Merchants* and *Lexington* declined to read into the insurance policy language at issue limitations or exclusions beyond those explicitly set forth in the four corners of the policy.  *Compare Lexington*, 21 Fed. Appx. at 590-91 (rebuffing insurers' argument that they should be allowed to aggregate, as one occurrence, losses from arson fires within a 72-hour period when policy contained explicit 72-hour exception only for earthquakes and floods); *Merchants*, 143 F.3d at 10 (observing that, if insurer "had really intended to limit coverage under the additional insured Endorsement to those situations in which an added insured such as [the general contractor] was to be held vicariously liable only for the negligence of a principal insured such as [the subcontractor]," the insurer "was free to draft a policy with qualifying language that expressly implemented that intention").

In short, the fact that Chubb chose not to require Maine State to take specific steps to maintain heat in the insured building begs the question of how to interpret the phrase at issue.

I, therefore, turn for guidance to *Sonrob*.  The *Sonrob* court's construction of the phrase "do [its] best" is a sensible one, which I conclude the Law Court would adopt were the question presented.  *See also Kennametal*, 908 F.2d at 100 n.2 ("While the phrase 'best efforts' is often

used to describe the extent of the implied undertaking, this has properly been termed an 'extravagant' phrase.  A more accurate description of the obligation owed would be the exercise of 'due diligence' or 'reasonable efforts.'") (citation and internal quotation marks omitted).

As the *Sonrob* court found, while the obligation to use reasonable efforts to "maintain heat" in a building contemplates that an insured will make reasonable efforts to "maintain heat at an adequate level throughout the building[,]" it does not necessarily require that an insured directly heat every room.  *Sonrob*, 2012 WL 5336966, at *8.

### c.   Is There a Triable Issue as to Maine State's Heating Efforts?

With those clarifications, I consider whether there is a triable issue as to whether Maine State undertook reasonable efforts to maintain heat at the Property.  I conclude that there is.

Chubb relies on the Niedbala investigation, as well as facts that subsequently have come to light regarding Swaka's failure to familiarize himself with the Property's heating systems, in support of the proposition that the evidence establishes as a matter of law that Maine State failed to use its best efforts to maintain heat in the building under either a subjective or objective standard. *See* S/J Motion at 9-11.  It contends that the investigation revealed not only that Maine State failed to do its best to maintain heat throughout the Property but also knew that it was not providing heat directly to the first floor/mezzanine retail area.  *See id*. at 9.

Nonetheless, the evidence construed in the light most favorable to Maine State suffices to raise a triable issue as to whether Maine State used reasonable efforts to maintain heat in the building.

The Sneller email indicates that (i) Maine State had relied without prior incident on a cross-heating system predicated on the use of residual heat from the basement boiler to heat the vacant first floor/mezzanine space, and, (ii) when its contractor, Multispec, replaced the boiler and

insulated pipes, no one – including Multispec – thought to turn on the warm air furnace.  *See* Plaintiff's Additional SMF ¶ 35; Exh. B to Niedbala Aff.  A trier of fact could conclude that, as in *Sonrob*, Maine State reasonably relied on a cross-heating system that had worked in the past and on the expertise of its contractor, Multispec, to alert it that the boiler and insulation work performed the summer prior to the loss jeopardized the efficacy of that system.  According to Sneller, Multispec did not do so.  *See id*.

Nor, Maine State's evidence indicates, was Swaka, who testified that he visited the Property daily, *see* Swaka Dep. at 91, placed on notice of the danger when he stopped in on the day prior to the loss.  While the temperature in Sanford, Maine, on the day of the loss was lower than it had been the prior two days, it had also been quite cold on those days, as well.  *See* Defendant's SMF ¶ 25; Plaintiff's Opposing SMF ¶ [25].  Yet, a contractor who was using the empty first-floor space as a staging area for a paint job on the day prior to the loss never complained that it was too cold to paint.  *See* Plaintiff's Additional SMF ¶ 33; Swaka Aff. ¶ 6.  The following morning, when Swaka began to receive reports from tenants that trouble was afoot, he was at work at Idexx.  *See* Defendant's SMF ¶¶ 7-8; Plaintiff's Opposing SMF ¶¶ [7]-[8]; Stipulations ¶ 15.  Moreover, Sneller's email indicates that Maine State confirmed *after* the loss that the warm air furnace had been turned off, cutting against the inference that it knew, prior to the loss, that it had not been providing heat directly to the first floor/mezzanine area.  *See* Plaintiff's Additional SMF ¶ 35; Exh. B to Niedbala Aff.

In these circumstances, a trier of fact reasonably could conclude that Maine State made reasonable efforts to maintain heat in the building.  *See, e.g.*, *Auto-Owners Ins. Co. v. Hansen Hous., Inc.*, 604 N.W.2d 504, 512 (S.D. 2000) (lower court's finding that a hospital owner had used its best efforts to maintain heat in insured hospital was not clearly erroneous when owner

"used electric heat to maintain the temperature in the building at between 45 and 50 degrees, and kept the boiler pumps circulating the water in the system[,]" "[t]he loss occurred in early November, before temperatures typically become extremely cold[,]" and hospital owner's principal had been in the building one or two weeks prior to the loss and "had found the temperature sufficient to prevent freezing").

The policy language at issue required that Maine State undertake reasonable efforts to maintain heat in the building, not that it succeed in doing so.  *See, e.g., Fredrich*, 408 S.W.2d at 612-14 (property owner did its best to maintain heat in a two-unit building when it supplied the heat source to the building, enabling the tenant in an occupied unit to maintain heat in his unit during an ice storm, even though a pipe froze in an attic above a vacant, unheated unit).

Moreover, viewing the evidence in the light most favorable to Maine State, it is not clear that Maine State's failure to turn on the warm air furnace caused the loss.  Maine State disputes Niedbala's finding that all damage occurred at the level of the first floor and below, asserting that there was flooding in the heated second-floor apartments.  Plaintiff's Opposing SMF ¶ [23]; Swaka Aff. ¶ 7.  Maine State also adduces evidence that, on February 15, 2016, a water pipe located inside an exterior wall in the vacant mezzanine/retail area of the Property froze even though the gas hot air furnace located on the mezzanine level was operating, maintaining a temperature of 60 degrees Fahrenheit in the retail area.  *See* Plaintiff's Additional SMF ¶¶ 36-37; Defendant's Reply SMF ¶¶ 36-37.  Chubb, which bears the burden of establishing that the conduct at issue was subject to a policy exclusion, *see, e.g., Fish*, 738 F. Supp.2d at 132, does not make clear whether the pipes that froze during the 2013 incident were located inside an exterior wall.  Assuming that they were, the 2016 incident tends to call into question the proposition that lack of heat in the first floor/mezzanine area caused the pipes to freeze in 2013.

Chubb, accordingly, fails to demonstrate its entitlement to summary judgment as to Counts I and II.

## 2. Unfair Claims Settlement Practices Claim

The UCSPA provides for a civil action against a person's own insurer for:

**A.**      Knowingly misrepresenting to an insured pertinent facts or policy provisions relating to coverage at issue;

**B.**      Failing to acknowledge and review claims, which may include payment or denial of a claim, within a reasonable time following receipt of written notice by the insurer of a claim by an insured arising under a policy;

**C.**      Threatening to appeal from an arbitration award in favor of an insured for the sole purpose of compelling the insured to accept a settlement less than the arbitration award;

**D.**      Failing to affirm or deny coverage, reserving any appropriate defenses, within a reasonable time after having completed its investigation related to a claim; or

**E.**      Without just cause, failing to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear.

24-A M.R.S.A. § 2436-A(1).

Maine State invokes subsections A and E, arguing that Chubb misrepresented Policy provisions and failed, without just cause, to resolve Maine State's claim favorably when it relied on an exclusion that had been superseded by the Water Exclusion Endorsement and insisted that "maintaining heat in the building" meant something more than "heating the building."   S/J Opposition at 7-8.

For the reasons discussed above, Maine State's premise that the Water Exclusion Endorsement replaced the exclusion on which Chubb relied, Exclusion B(2)(g), is flawed.  Chubb, therefore, cannot be liable for a UCSPA violation on this basis.

Chubb's interpretation of the meaning of Exclusion B(2)(g) likewise does not form a predicate for UCSPA liability under either subsection A or subsection E.  As Chubb notes, *see* S/J

23

Reply at 6, "[t]o establish a knowing misrepresentation [for purposes of subsection A of the UCSPA], a plaintiff must provide evidence demonstrating something more than a mere dispute between the insurer and insured as to the meaning of certain policy language[,]" *Lamontagne v. North Am. Specialty Ins. Co.*, 353 F. Supp.2d 129, 135 (D. Me. 2005) (citation and internal quotation marks omitted). Yet, Maine State offers no evidence from which a reasonable trier of fact could infer that the disagreement between itself and Chubb was anything more than a mere dispute as to the meaning of certain policy language.

Nor does Maine State establish a triable issue of fact as to whether it failed, without just cause, to effectuate the settlement of a claim "in which liability ha[d] become reasonably clear." 24-A M.R.S.A. §2436-A(1)(E). As Chubb notes, *see* S/J Motion at 13, "the touchstone of [the] inquiry . . . is whether the insurer lacked any legitimate or reasonable basis to contest liability[,]" *School Union No. 37 v. United Nat'l Ins. Co.*, 617 F.3d 554, 564 (1st Cir. 2010). Thus, "any legitimate doubt regarding liability is a safe harbor under UCSPA." *Id.* (internal punctuation omitted). "[T]he fact that [an insurer is] ultimately unsuccessful in pursing . . . defenses to coverage does not automatically render its actions unreasonable under UCSPA." *Id.*

Here, as in *School Union No. 37*, Chubb denied coverage in circumstances in which the meaning of the exclusion on which it relied was not clear under Maine law, raising "legitimate and reasonable doubts regarding the scope of its liability" for the loss at issue. *Id.* While Maine State adduces sufficient evidence to demonstrate the existence of a triable issue as to whether Chubb properly denied coverage for the loss pursuant to Exclusion B(2)(g), it adduces no evidence from which a trier of fact could conclude that Chubb lacked any legitimate or reasonable basis to contest coverage.

Chubb, accordingly, is entitled to summary judgment as to Count III of the complaint.

## II.  Motion To Exclude Expert Testimony

### A.  Applicable Legal Standards

Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> **(a)**    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)**    the testimony is based on sufficient facts or data;
>
> **(c)**    the testimony is the product of reliable principles and methods; and
>
> **(d)**    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Under Rule 702, "it is the responsibility of the trial judge to ensure that an expert is sufficiently qualified to provide expert testimony that is relevant to the task at hand and to ensure that the testimony rests on a reliable basis."  *Beaudette v. Louisville Ladder, Inc*., 462 F.3d 22, 25 (1st Cir. 2006).

### B.  Background

Averill provides a July 22, 2015, expert report in which he indicates that he is a Chartered Property Casualty Underwriter, has been employed in the property and casualty insurance business since June 1971, and was involved in the development on behalf of the Insurance Services Office, Inc. ("ISO") of the model version of the policy in question.  *See* Expert Report ("Averill Report"), attached to Plaintiffs' Designation of Expert Witnesses (ECF No. 24-1), attached to Motion To Exclude, at 2-3.

Averill intends to offer opinions that:

1.    The exclusion and definition provisions of the Policy did not permit Chubb to deny coverage to Maine State on the basis of lack of heat in a portion of the building.  *See id*. at 3, ¶ 1.

25

2.      The Water Exclusion Endorsement superseded Exclusion B(2)(g).  *See id*. at 3, ¶ 2.

3.      Maine State continued to provide heat to the building.  *See id*. at 3-4, ¶ 3.

4.      In light of the Policy's definition of the word "Building" and Chubb's omission of any endorsement making coverage contingent on heat being maintained in a portion of the building, Chubb misinterpreted Exclusion B(2)(g) to exclude coverage when a named insured does not take precautions to heat only a portion of a building (in this case, the first floor).  *See id*. at 4, ¶ 4.

5.      Chubb chose to issue the Policy despite having the opportunity to inspect the building both before and after insuring it, and cannot void coverage by reaching for a possible interpretation of policy language.  *See id*. at 4-5, ¶ 5.  Chubb's intentional misinterpretation of policy language in order to deny a claim has placed Maine State in an unexpected and unwarranted financial situation.  *See id*. at 5, ¶ 5.

### C.  Discussion

As Chubb argues, *see* Motion To Exclude at 4-5, the interpretation of insurance policy language is a matter of law, and, hence, the province of the court, *see, e.g., City of S. Portland v. Maine Mun. Ass'n*, 2008 ME 128, ¶ 7, 953 A.2d 1128, 1130 ("The interpretation of an insurance contract is a question of law[.]").  Every one of Averill's opinions invades that province.  Indeed, as a function of deciding Chubb's motion for summary judgment, I have resolved disputes between the parties as to the proper interpretation of the relevant policy language.  To the extent that Averill's opinions bear on Maine State's UCSPA claim, the same is true: Averill identifies no basis for his opinion that Chubb intentionally misread policy language to deny Maine State's claim apart from his own interpretation of the language at issue.  *See* Expert Report at 9; Plaintiff Maine State Properties, LLC's Memorandum in Opposition to Defendant Chubb Custom Insurance Company's

Motion To Exclude the Expert Testimony of Michael L. Averill ("Opposition/Exclude") (ECF No. 29) at 2-5.  Averill's opinions, hence, are stricken as irrelevant and unhelpful to the trier of fact.[16]

### III.  Conclusion

For the foregoing reasons, I **GRANT** Chubb's motion for summary judgment as to Count III of the complaint and otherwise **DENY** it, and **GRANT** its motion to exclude the expert testimony of Michael Averill.

Dated this 8th day of July, 2016.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge

---

[16] Maine State argues that, because the policy language at issue is ambiguous, evidence of facts and circumstances demonstrating the parties' intent is admissible, and Averill's opinions "may be relevant to its meaning in light of insurance industry custom and practice."  Opposition/Exclude at 2-3.  Yet, the case that Maine State cites for that proposition does not concern interpretation of an insurance policy.  *See id*. at 2 (citing *Benton Falls Assocs. v. Central Me. Power Co*., 2003 ME 99, ¶ 13, 828 A.2d 759, 763).  As Chubb counters, *see* Defendant Chubb Custom Insurance Company's Reply Memorandum in Support of Motion To Exclude the Expert Testimony of Michael L. Averill (ECF No. 32) at 2-3, Law Court decisions suggest that the construction of ambiguous insurance policy language remains a question of law, *see, e.g., Peerless Ins. Co. v. Wood*, 685 A.2d 1173, 1174 (Me. 1996) ("The meaning of the language used in an insurance contract is a question of law.  Insurance policies are liberally construed by this court in favor of the insured and any ambiguity in the contract is resolved against the insurer.  In applying these rules of construction, we view the contract language from the perspective of an average person, *untrained in either the law or the insurance field*, in light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured.") (citations omitted) (emphasis added).